# 354 DOREMUS AVE
# NEWARK NJ 07105

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA

Civil Action No. _____

TOD MICKES

_Plaintiff_

vs.

**STATE OF MONTANA;
MONTANA GOVERNOR
GREG GIANFORTE;
MONTANA ATTORNEY
GENERAL AUSTIN KNUDSEN**

_Defendants_

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF
(**42 U.S.C. § 1983**)

## CIVIL RIGHTS COMPLAINT UNDER 42 U.S.C. § 1983
## FOR DECLARATORY & INJUNCTIVE RELIEF

### PLAINTIFF

TOD MICKES

### *Plaintiff*

Plaintiff, is a United States citizen, and a user of social media. Plaintiff's current mailing address is 354 Doremus Ave, Newark NJ 07105. Plaintiff uses TikTok to promote talents, seek income, and share speech. Plaintiff will be irreparably harmed if the Montana TikTok ban is allowed to come into effect.

**Plaintiff also specifically uses TikTok to:**

FIND JOBS; EARN MONEY

### STATE ACTORS & DEFENDANTS

### STATE OF MONTANA

*a sovereign state government within the United States of America*

### GOVERNOR GREG GIANFORTE,

*individually and in his official capacity as Governor, State of Montana,*

*the Chief Executive Officer of the State Montana*

GOVERNOR'S OFFICE, STATE CAPITOL, PO BOX 200801 HELENA MT 59620

is sued in his official and individual capacity

**HE ENFORCES AND SETS POLICY OF CRIMINAL LAWS IN MONTANA**

_____

**ATTORNEY GENERAL AUSTIN KNUDSEN**,

*individually and in his official capacity as Attorney General, State of Montana,*

*the chief law enforcement officer of the State of Montana and head of the*

*Montana Department of Justice*

ATTORNEY GENERAL, 215 N. SANDERS ST, HELENA MT 59601

is sued in his official and individual capacity

**HE IS TASKED WITH ENFORCING CRIMINAL LAWS IN MONTANA**

_____

_____

***Represented by the Montana Attorney General, Montana Department of***

***Justice***

ATTORNEY GENERAL, 215 N. SANDERS ST, HELENA MT 59601

_____

## STATEMENT OF JURISDICTION

**Federal Jurisdiction is provided via 28 U.S.C. 1331 &**

**42 U.S.C. § 1983.**

The Eleventh Amendment to the United States Constitution does not bar suits

against the State when the State terminates a state-created liberty interest

without due process. The United States Supreme Court has "repeatedly held

that state statutes may create liberty interests that are entitled to the

procedural protections of the Due Process Clause of the Fourteenth

Amendment." Vitek v. Jones, 445 U.S. 480, 488, 100 S. Ct. 1254, 63 L. Ed. 2d

552 (1980)

A constitutionally protected liberty interest can arise from the Constitution or

from state statutes, policies and practices.  Hewitt v. Helms, 459 U.S. 460, 466

(1983)

**It is beyond dispute that federal courts have jurisdiction over suits to**

**enjoin state officials from interfering with federal rights.**

See *Ex parte Young,* 209 U.S. 123, 160-162 [28 S. Ct. 441, 454-55, 52 L. Ed.

714] (1908).

## STATEMENT OF VENUE

The District of Montana is an appropriate venue for this action under 28 U.S.C.

§ 1391(b)(1) because the State of Montana Defendants in their official capacity

reside in this district, as does the state capitol.

---

## WHAT IS SOCIAL MEDIA?

### ONE FEDERAL COURT DISCUSSED SOCIAL MEDIA.

### Vital Pharm. Inc. v. Owoc (In re Vital Pharm., Inc.), 652 B.R. 392 (Bankr. S.D. Fla. June 16, 2023)

**"To understand the history of social media and its rapid evolution is to understand the need for regulation and standardization, including the issue of ownership. The earliest social networking sites date back more than two decades with the launch of SixDegrees.com (1997), 2 Friendster (2001), 3 and Myspace (2003). 4 Peaking at 115 million users, Myspace was the most popular social network site from 2005 to 2008.5**

By 2009, however, Facebook eclipsed Myspace and has since grown to nearly three billion users. 6 During that time, many other sites have proliferated the social media landscape, offering a myriad of ways for users to share content or engage with otherse.g., Twitter (microblogging); Instagram (photo-sharing); TikTok (short videos); Snapchat ("stories"); Reddit (news aggregation); Pinterest ("pinboards"); and YouTube (hosting a wide range of video content). In 2023, there are reportedly more than 4.75 billion social media users worldwide. 7

As the use of social media has evolved as a means of social interaction, so too has its use for business. Before the meteoric rise of Facebook, direct consumer engagement on a large scale had not been possible. 8 Now, not only do social media sites monetize their content by allowing ads, but companies also use social media to affect buying habits through "a type of social media marketing that uses endorsements and product mentions from influencers individuals

who have a dedicated social following and are viewed as experts within their niche."9 Social media influencers "have perfected the art of self-commoditization, turning their personal image or reputation (also known as their 'brand' or 'persona') and their recommendations into highly valuable tools."10 In 2023, influencer marketing is projected to be a $21.1 billion industry.11

Describing a user's interest in a social media account is difficult. With respect to some sites, such as TikTok and Twitter, a social media user's right to use the platform is defined as a "license." But, in some cases, such as Instagram, that right is not defined at all. For ease of reference, the Court will refer to "ownership of the rights to social media accounts" to encompass whatever rights a user has whether it be a license or otherwise to access and use a social media account.

2

Social Media, Encyclopedia Britannica, https://www.britannica.com/topic/social-media#ref1303882; see also Gonzalez v. Google LLC, 2 F.4th 871, 951 n.8 (9th Cir. 2021) (Katzman, C.J., concurring).

3

Matthew Jones, The Complete History of Social Media: A Timeline of the Invention of Online Networking (Hist. Cooperative June 16, 2015), https://historycooperative.org/the-history-of-social-media/).

4

Myspace, Encyclopedia Britannica, https://www.britannica.com/topic/Myspace ("Tom Anderson and Chris DeWolfe, employees of the Internet marketing company eUniverse (later Intermix Media), created Myspace in 2003.").

5

Social Media, Encyclopedia Britannica, https://www.britannica.com/topic/Myspace; see also Myspace, Wikipedia, https://en.wikipedia.org/wiki/Myspace; The Evolution of Social Media: How Did it Begin, and Where Could it Go next, Maryville University, https://online.maryville.edu/blog/evolution-social-media/.

6

Myspace, Wikipedia, https://en.wikipedia.org/wiki/Myspace; Facebook,
Wikipedia, https://en.wikipedia.org/wiki/Facebook.

7

Social Media, Wikipedia, https://en.wikipedia.org/wiki/Social_media.

8

Facebook, Encyclopedia Britannica,
https://www.britannica.com/topic/Facebook.

9

Evolution of Social Media, supra note 5 (quoting What is influencer marketing:
How to develop your strategy, Sprout Social,
https://sproutsocial.com/insights/influencer-marketing/ (Apr. 17, 2023)).

10

Grace Greene, Comment, Instagram Lookalikes and Celebrity Influencers:
Rethinking the Right to Publicity in the Social Media Age, 168 U. PA. L. Rev.
Online 153, 155 (2020).

11

Werner Geyser, The State of Influencer Marketing 2023: Benchmark
Report (Feb. 2023).

12

28

In the social media context, there seems to be as many types of "names" as
there are social media platforms. Each platform has a "username." But a
Twitter user's "username" is synonymous with their "handle." And, in addition
to a "username," Instagram users often refer to a "displayed name." Here, the
Court's use of "name" is intended to encompass all the various types of social
media "names."

29

2023 U.S. Dist. LEXIS 42962, 2023 WL 2503432, at *9 (S.D.N.Y. Mar. 14,
2023) ("The issue of ownership of a social media account is novel, and few

courts have examined the question.").

54"

## **POINTS & AUTHORITIES**

TikTok is a mobile social media application.

*TikTok allows users, including Plaintiff, to create, share, and view short-form videos - ranging from 15 to 60 seconds in length - on any subject, including politics, comedy, music, and social issues. Plaintiffs consume a variety of content on the app, such as self-help videos, finance videos, psychology videos, and political videos. [Ms.] Rinab, for instance, has experienced greater success in her college finance classes by watching TikTok videos explaining market manipulation schemes, and has used the app to learn about a presidential candidate's views on climate change and gun control.*

*[Many] also rely on TikTok to earn a living. The app has over 700 million users globally, and over 100 million users in the United States alone. Fifty million of these U.S. users use the app on a daily basis. This large audience gives content creators like Plaintiffs the opportunity to profit from the videos they post on TikTok. [Ms.] Rinab, for example, creates videos for fashion brands and other companies, and earns between $5,000 and $10,000 per video. Further, the exposure Plaintiffs have obtained through TikTok has resulted in promotional and branding opportunities. For instance, [one U.S. user] earned $12,000 for promoting the Extra gum brand in a TikTok video.*

Marland v. Trump, <u>498 F. Supp. 3d 624</u>, 2020 U.S. Dist. LEXIS 202572, 2020 WL 6381397 (E.D. Pa., Oct. 30, 2020) (U.S. District Court No.: 2-20-cv-04597).

In late 2020, the U.S. District Court for the Eastern District of Pennsylvania enjoined the U.S. federal government from banning TikTok. <u>Marland v. Trump,</u> <u>498 F. Supp. 3d 624</u>, 2020 WL 6381397 (E.D. Pa. 2020). The U.S. District Court for the District of Columbia then barred the removal of TikTok from U.S. app stores, finding that such removal may "likely exceed" the bounds of the law. <u>TikTok Inc. v. Trump</u>, <u>490 F. Supp. 3d 73</u>, 80 (D.D.C. 2020).

<u>The Montana TikTok ban is impermissibly overbroad. "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"</u> *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, <u>176 L. Ed. 2d 435</u> (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S. Ct. 1184, <u>170 L. Ed. 2d 151</u> (2008)). "Technically, the overbreadth doctrine does not apply if the parties challenging the statute engage in the allegedly protected expression," as Plaintiffs did here, because the doctrine is used "to

overcome what would otherwise be a plaintiff's lack of standing." *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997). "A party seeking to challenge the constitutionality of a statute generally must show that the statute violates the party's own rights," but "[t]he First Amendment overbreadth doctrine carves out a narrow exception to that general rule." *United States v. Stevens*, 559 U.S. 460, 483, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (Alito, J., dissenting) (citations omitted). Plaintiffs, however, may still "seek, as a remedy, the facial invalidation of [a statute] if it is an overly broad regulation that create[s] an unacceptable risk of the suppression of ideas." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790 n.9 (9th Cir. 2006) (citation and quotation marks omitted).

But "because a successful overbreadth challenge renders a statute unconstitutional and, therefore, invalid in *all* its applications . . . the doctrine is employed sparingly and only as a last resort." *United States v. Alvarez*, 617 F.3d 1198, 1236 (9th Cir. 2010) (emphasis in original) (citations and quotation marks omitted), *aff'd*, 567 U.S. 709, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012). Accordingly, when a litigant brings both an as-applied and facial challenge, the Supreme Court has strongly suggested that courts should address the facial challenge only if the as-applied challenge fails. *See Serafine v. Branaman*, 810 F.3d 354, 363 n.19 (5th Cir. 2016) (collecting cases).

"Content-based laws-those that target speech based on its communicative content-are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. This requires the government to show that the law is "the least restrictive means to further a compelling interest." *Foti v. City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998) (citation omitted). Because the Montana TikTok ban is effectively content-based, Defendant must establish that, when applied to Plaintiffs' speech, the statute is narrowly tailored to a compelling state interest. *See Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966, 974 (9th Cir. 2009), *rev'd on other grounds*, 135 S. Ct. 2218, 192 L. Ed. 2d 236.

"As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527, 121 S. Ct. 1753, 149 L. Ed. 2d 787 (2001) (quoting *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102, 99 S. Ct. 2667, 61 L. Ed. 2d 399 (1979)). "More specifically, [the Supreme Court] has repeatedly held that 'if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order.'" *Id.* at 527-28 (quoting *Daily Mail*, 443 U.S. at 103).8

Plaintiff contends that <u>Montana TikTok ban</u> violates the dormant Commerce Clause as applied to Plaintiff and other out-of-state actors because the statute restricts speech that occurs wholly outside Montana's borders. (citing *Healy v. Beer Inst.*, <u>491 U.S. 324</u>, 336, 109 S. Ct. 2491, <u>105 L. Ed. 2d 275</u> (1989) ("The 'Commerce Clause . . . precludes the application of state statutes to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State").

<u>"[A]s both the means to engage in commerce and the method by which transactions occur, 'the Internet is an instrumentality and channel of interstate commerce,'"</u> *United States v. Sutcliffe*, <u>505 F.3d 944</u>, 953 (9th Cir. 2007) (quoting *United States v. Trotter*, <u>478 F.3d 918</u>, 921 (8th Cir. 2007) (per curiam)). Thus, "regulation of the Internet impels traditional Commerce Clause considerations." *American Libraries Ass'n v. Pataki*, <u>969 F. Supp. 160</u>, 173 (S.D.N.Y. 1997).

"The Commerce Clause of the United States Constitution assigns to Congress the authority '[t]o regulate Commerce with foreign Nations, and among the several States.'" *Sam Francis Foundation v. Christies, Inc.*, <u>784 F.3d 1320</u>, 1323 (9th Cir. 2015) (quoting U.S. Const. art. <u>I</u>, <u>8</u>, cl. 3). "Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336.

"Courts have long read a negative implication into the clause, termed the 'dormant Commerce Clause,' that prohibits states from discriminating against interstate commerce." *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, <u>731 F.3d 843</u>, 846 (9th Cir. 2013). The doctrine "bars state regulations that unduly burden interstate commerce." *Quill Corp. v. North Dakota*, <u>504 U.S. 298</u>, 312, 112 S. Ct. 1904, <u>119 L. Ed. 2d 91</u> (1992) (citation omitted). "[A] statute violates the dormant Commerce Clause per se when it directly regulates interstate commerce." *Pharm. Research and Mfrs. of America v. Cty. of Alameda*, <u>768 F.3d 1037</u>, 1043 (9th Cir. 2014) (quoting *Assoc. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, <u>729 F.3d 937</u>, 949 (9th Cir. 2013)) (internal quotation marks omitted). "Direct regulation occurs when a state law directly affects transactions that take place across state lines or entirely outside of the state's borders." *Id.* (quoting *S.D. Myers, Inc. v. City and Cty. of S.F.*, <u>253 F.3d 461</u>, 467 (9th Cir.2001)) (internal quotation marks omitted).

Under the extraterritoriality doctrine, any "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature," *Rocky Mountain Farmers Union v. Corey*, <u>730 F.3d 1070</u>, 1101 (9th Cir. 2013)

("*RMFU*") (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)), and regardless of "whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336. To determine whether state legislation violates the dormant Commerce Clause, "[t]he critical inquiry is whether the practical effect of the [legislation] is to control conduct beyond the boundaries of the State." *Id.*

"Although the Ninth Circuit has not reached this issue, courts in several circuits have invalidated state laws regulating the internet" where the statute regulates conduct occurring outside the borders of the state. *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F.Supp. 2d 946, 958 (N.D. Cal. 2006) (collecting cases). In contrast, courts have upheld state regulation of the internet where application of the law has been limited to only local conduct, or where "[a] state would enforce the law only against conduct occurring within the state." *Id.* (collecting cases); *see also Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 432-33 (9th Cir. 2014) ("*Agency on Deafness*") (holding that California statute that required captioning of online videos for California viewers did not regulate out-of-state conduct because CNN could create a separate website specific to California users).

The presence or absence of a plaintiffs' standing to sue is an essential component of the Court's subject-matter jurisdiction; the absence of sufficient standing deprives the Court of such jurisdiction, requiring dismissal. Palma, 707 F.3d at 1153. The question of standing involves "both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." Kowalski v. Tesmer, 543 U.S. 125, 128-29, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004).

Constitutionally, the obligation of a party to demonstrate its standing flows from Article III's "case or controversy" requirement. Id. To establish standing to sue, a plaintiff must demonstrate: (i) that it has suffered a concrete and particular injury in fact that is either actual or imminent; (ii) that the injury is fairly traceable to the alleged actions of the defendant; and (iii) that the injury will likely be redressed by a favorable decision. Kerr, 744 F.3d at 1163; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

The Due Process Clause of the Fourteenth Amendment provides that the government may not deprive "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, 1. Due process thus "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997). Indeed, "[t]he touchstone

of due process is protection of the individual against arbitrary action of government, whether the fault lies in the denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (internal citations and quotations omitted).

The Due Process Clause "confers both substantive and procedural rights." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). Substantive due process "prohibits States from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest." *Lawrence v. Texas*, 539 U.S. 558, 593, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003). Procedural due process "'minimize[s] substantively unfair or mistaken deprivations of life, liberty, or property" by guaranteeing all persons fair procedures by which they may "contest the basis upon which a State proposes to deprive them of protected interests." *Carey v. Piphus*, 435 U.S. 247, 259-60, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 87, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)). Put simply, "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, [procedural due process requires that] it must still be implemented in a fair manner." *Salerno*, 481 U.S. at 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

To invoke the protection of the Due Process Clause, a petitioner first must identify a protected interest to which such protection extends, and demonstrate a governmental deprivation of that interest. *See Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005) (explaining that the Due Process Clause "protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake"); *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (noting that a substantive due process claim requires that a plaintiff, "as a threshold matter, show a government deprivation of life, liberty, or property"); *see also Ingraham v. Wright*, 430 U.S. 651, 672, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977) (noting that due process – whether procedural or substantive - "is required only when a decision of the State implicates an interest within the protection of the Fourteenth Amendment"). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty' . . . or it may arise from an expectation or interest created by state laws or policies." *Austin*, 545 U.S. at 221; *see also Sandin v. Conner*, 515 U.S. 472, 483-84, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995) (noting that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause").

If the liberty interest at stake is "fundamental," substantive due process forbids government infringement "'*at all,* no matter what process is provided, unless the

infringement is narrowly tailored to serve a compelling state interest.'" *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993); *cf. Glucksberg*, 521 U.S. at 720 (noting that substantive due process protects only certain "fundamental" liberty interests); *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (explaining that "[t]he range of liberty interests that substantive due process protects is narrow," and therefore "[o]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause").

The procedural component of the Due Process Clause, on the other hand, "protects more than just fundamental rights. It protects all liberty interests that are derived from state law or from the Due Process Clause itself." *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Eldridge*, 424 U.S. at 332. Due process, however, is "flexible and calls for such procedural protections as the particular situation demands.'" *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)); *see also Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961) (noting that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation"). To determine if a particular procedure satisfies due process, the court must weigh three factors: "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Eldridge*, 424 U.S. at 335.      As the Supreme Court has observed, "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976).

The Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *U.S. Const.* amend. XIV, 1.

"[D]ue process rights are found whenever an individual risks governmental exposure to a 'grievous loss.'" (quoting *Morrissey v. Brewer,* 408 U.S. 471, 484, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484, 494 (1972))

Individuals are entitled to due process of law before being deprived of a protected liberty interest. *Whitehorn v. Harrelson*, 758 F.2d 1416, 1419 (11th Cir. 1985). An individual's substantive due process rights are violated by government action that is "arbitrary or conscience shocking," regardless of the procedures used to implement the action. *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1304-05 (11th Cir. 2003)

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV 1.7 The Fourteenth Amendment's due process clause provides both procedural and substantive protections. Although federal procedural due process protections do not preclude governmental deprivations of life, liberty, or property, they do require that such deprivations include certain procedural safeguards. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Substantive due process protections, in contrast, "bar certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Franklin v. United States*, 49 F.4th 429, 435 (5th Cir. 2022).

The property interests protected by federal due process "are not created by the [United States] Constitution." *Roth*, 408 U.S. at 577. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" *Id.*; *see also Schaper v. City of Huntsville*, 813 F.2d 709, 714 (5th Cir. 1987) ("Once a state confers a property right, it cannot constitutionally deprive such an interest without procedural safeguards."). Whether a *state*-created property interest "rises to the level" of a constitutionally-protected interest, however, is determined by *federal* constitutional law. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005); *Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020), *cert. denied sub nom. Wigginton v. Univ. of Mississippi*, 141 S. Ct. 1268, 209 L. Ed. 2d 10 (2021). Even so, "[r]esolution of the federal issue [] begins with a determination of what it is that state law provides." *Castle Rock*, 545 U.S. at 757. And, though protected property interests "extend well beyond actual ownership of real estate, chattels, or money," a legitimate claim of entitlement is required. *Roth*, 408 U.S. at 571-72.

Federal law also determines what procedural protections the Fourteenth Amendment requires. This is true even where state law is the source of the protected property right at issue. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) ("the answer to the question of what process is due 'is not to be found in a [state] statute'"). Thus, although state action may constitute a breach of contract or a violation of state law, federal due process is *not* violated "every time a . . . government entity violates its own [procedural] rules." *Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985) (emphasis added). Rather, "unless the conduct trespasses on federal constitutional safeguards, there is no [federal] constitutional deprivation." *Id.* In other words, where the procedures utilized satisfy the constitutional minimum, "entitlement to something more by virtue of [state rules] [is] a matter of state law, *not* [federal] constitutional law." *Id.* at 1231 (emphasis added). *See also Jackson v. Pierre*, 810 Fed. App'x 276, 279 (5th Cir. 2020) (summary calendar) (per curiam) (requirements of procedural due

process not violated simply by virtue of officials' failure to comply with university's internal rules or policies); *Dearman v. Stone Cnty. Sch. Dist.*, 832 F.3d 577, 584 (5th Cir. 2016) (whereas denial of official nonrenewal hearing may have violated state law, federal due process was satisfied by receipt of notice and an opportunity to respond); *Brown v. Texas A&M Univ.*, 804 F.2d 327, 335 (5th Cir. 1986) (state university's failure to comport with internal procedures does not by itself amount to violation of federal due process requirements).

Federal procedural due process requirements are "flexible and call for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The core requirement of federal procedural due process is the "'opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)).

Conversely, a violation of substantive due process occurs, regardless of procedural protections, when (i) a governmental entity deprives a plaintiff of a constitutionally protected property interest; and (ii) the government's deprivation lacks a rational basis. *See Simi Inv. Co., Inc. v. Harris Cnty.*, 236 F.3d 240, 249-50 (5th Cir. 2000); *see also Daniels*, 474 U.S. at 331 (procedural fairness is not determinative of substantive protections); *Franklin*, 49 F.4th at 435 (same).

In a procedural due process claim, the Court must first assess whether a liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient. *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506, 514 (1989)).

"A 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). When state law provides an adequate means to remedy the alleged procedural deprivation, there is no due-process violation regardless of whether the plaintiff availed himself of that remedy. *See McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (*en banc*); *Horton v. Bd. of Cnty. Comm'rs of Flagler Cnty.*, 202 F.3d 1297, 1300 (11th Cir. 2000).

A constitutional-due-process violation occurs when the state refuses to provide a process adequate to remedy that procedural deprivation. *See McKinney,* 20 F.3d at 1557, 1563; *Horton*, 202 F.3d at 1300. "The question is thus whether the state provided the means to present [their] allegations, demonstrate that the [action] was wrongful, and receive redress from that deprivation," whether they used that process or not. *Reams v. Irvin*, 561 F.3d 1258, 1266 (11th Cir. 2009).

*See, e.g., Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002) ("As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct 'shocks the conscience.'").

"[T]he Equal Protection Clause requires government entities to treat similarly situated people alike." *Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006). Plaintiffs can bring equal-protection claims as a class of one if they assert (1) intentional (2) treatment that is different from treatment of similarly situated others, (3) with no rational basis. *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1201 (11th Cir. 2007).

"In 'the courts of this country'-including the federal courts-the common law bestows upon the public a right of access to public records and documents." Wash. Legal Found. v. U.S. Sent'g Comm'n (WLF II), 89 F.3d 897, 902, 319 U.S. App. D.C. 256 (D.C. Cir. 1996) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978)). In Nixon, "the Supreme Court was unequivocal in stating that there is a federal common law right of access 'to inspect and copy public records and documents.'" Id. (quoting Nixon, 435 U.S. at 597). "[T]he general rule is that all three branches of government, legislative, executive, and judicial, are subject to the common law right." Id. at 903 (quoting Schwartz v. U.S. Dep't of Just., 435 F. Supp. 1203, 1203 (D.D.C. 1977)). The right of access is "a precious common law right . . . that predates the Constitution itself." United States v. Mitchell, 551 F.2d 1252, 1260, 179 U.S. App. D.C. 293 (D.C. Cir. 1976), rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978).

The common law right of access "is fundamental to a democratic state." Id. at 1258; cf. Cowley v. Pulsifer, 137 Mass. 392, 394 (1884) (Holmes, J.) ("[I]t is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."). "Like the First Amendment, then, the right of inspection serves to produce 'an informed and enlightened public opinion.'" Mitchell, 551 F.2d at 1258 (quoting Grosjean v. Am. Press Co., 297 U.S. 233, 247, 56 S. Ct. 444, 80 L. Ed. 660 (1936)).

Courts have recognized that "openness in government has always been thought crucial to ensuring that the people remain in control of their government." In re Sealed Case, 121 F.3d 729, 749, 326 U.S. App. D.C. 276 (D.C. Cir. 1997). "Neither our elected nor our appointed representatives may abridge the free flow of information simply to protect their own activities from public scrutiny. An official policy of secrecy must be supported by some legitimate justification that serves the interest of the public office." Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cty., 478 U.S. 1, 19, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (Stevens,

J., dissenting). In the analogous Freedom of Information Act (FOIA) context, the United States Supreme Court has made clear that citizens "know[ing] 'what their Government is up to' . . . [is] a structural necessity in a real democracy." Nat'l Archives & Recs. Admin. v. Favish, <u>541 U.S. 157</u>, 171-72, 124 S. Ct. 1570, <u>158 L. Ed. 2d 319</u> (2004) (quoting U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press, <u>489 U.S. 749</u>, 773, 109 S. Ct. 1468, <u>103 L. Ed. 2d 774</u> (1989)).1

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although the Eleventh Amendment expressly prohibits only suits against states by citizens of other states, the Supreme Court has long held that the Eleventh Amendment also bars suits by citizens of the state being sued. See Hans v. Louisiana, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890); Welch v. Texas Dep't of Highways and Public Transp., 483 U.S. 468, 472-73, 107 S. Ct. 2941, 97 L. Ed. 2d 389 (1987) (plurality opinion).

"There are three qualified exceptions to Eleventh Amendment immunity[.]" Lawson v. Shelby County, TN, 211 F.3d 331, 334 (6th Cir. 2000). "First, a state may waive the protection of the Amendment by consenting to the suit." Lawson, 211 F.3d at 334. "The second exception to the Eleventh Amendment bar is that Congress, under certain provisions of the Constitution, may abrogate the sovereign immunity of the states through statute." Id. "Under the third exception, a federal court may enjoin a 'state official' from violating federal law." Id. at 335 (citing Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)).

<u>The Supreme Court has "repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment."</u> Vitek v. Jones, <u>445 U.S. 480</u>, 488, <u>63 L. Ed. 2d 552</u>, 100 S. Ct. 1254 (1980).

## CAUSES OF ACTION

## COUNT 1: DENIAL OF DUE PROCESS, SUBSTANTIVE AND PROCEDURAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION IN VIOLATION OF 42 U.S.C. § 1983

The Montana TikTok ban, 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023]

(effective January 1, 2024), Plaintiff and others similarly situated, have had their

constitutional rights stripped, specifically constitutional rights to due process of

law, property rights, business interests and speech. The State of Montana;

Montana Governor Greg Gianforte; Montana Attorney General Austin Knudsen have all deprived Plaintiff of these rights by passing the Montana TikTok ban. Under the Montana Tiktok ban, the State of Montana revokes the right to free speech, communication, dissemination, access to information, political speech, political organizing, freedom of religion,  creativity, freedom of association, earning a living without due process,  nor rational basis.  The Fifth and Fourteenth Amendments are binding on the states via the Fourteenth Amendment. All other parts of this document are incorporated by reference.

## COUNT 2: DENIAL OF DORMANT COMMERCE CLAUSE , U.S. CONST., ART. I, § 8, CL. 3 & FOURTEENTH AMENDMENT INCORPORATION CLAUSE IN VIOLATION OF 42 U.S.C. § 1983

The Montana TikTok ban, 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024), Plaintiff and others similarly situated, have had their constitutional rights stripped, specifically their constitutional rights under the dormant commerce clause, damaging business and trade. The State of Montana; Montana Governor Greg Gianforte; Montana Attorney General Austin Knudsen have all deprived Plaintiff of these rights by passing the Montana TikTok ban. Under the Montana Tiktok ban, the State of Montana revokes the right to free speech, communication, dissemination, access to information, political speech, political organizing,  creativity, freedom of association, earning a living, business, employment without due process, nor rational basis.  The Fifth and Fourteenth Amendments are binding on the states via the Fourteenth Amendment. All other parts of this document are incorporated by reference.

## COUNT 3: DENIAL OF FIRST AMENDMENT RIGHT TO FREE SPEECH & FOURTEENTH AMENDMENT INCORPORATION CLAUSE IN VIOLATION OF 42 U.S.C. § 1983

The Montana TikTok ban, 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024), Plaintiff and others similarly situated, have had their constitutional rights stripped, specifically their constitutional rights to free speech and equal protection. The State of Montana; Montana Governor Greg Gianforte; Montana Attorney General Austin Knudsen have all deprived Plaintiff of these rights by passing the Montana TikTok ban. Under the Montana Tiktok ban, the State of Montana revokes the right to free speech, promote and conduct business, communication, dissemination, access to information, political speech, political organizing, creativity, freedom of association without due process, nor rational basis. The Fifth and Fourteenth Amendments are binding on the states via the Fourteenth Amendment. All other parts of this document are incorporated by reference.

## COUNT 4: DENIAL OF EQUAL PROTECTION & FOURTEENTH AMENDMENT INCORPORATION CLAUSE IN VIOLATION OF 42 U.S.C. § 1983

The Montana TikTok ban, 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024), Plaintiff and others similarly situated, have had their constitutional rights stripped, specifically their constitutional rights to free speech and equal protection, for their businesses and personal use. The State of Montana; Montana Governor Greg Gianforte; Montana Attorney General Austin Knudsen have all deprived Plaintiff of these rights by passing the Montana TikTok ban. Under the Montana Tiktok ban, the State of Montana revokes the

right to free speech, communication, dissemination, access to information, political speech, religious speech, corporate speech, political organizing, creativity, freedom of association without due process, nor rational basis. The Fifth and Fourteenth Amendments are binding on the states via the Fourteenth Amendment. All other parts of this document are incorporated by reference.

## STATEMENT OF FACTS

The State of Montana has enacted a draconian state law banning TikTok, *see* 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024). The Montana TikTok ban proscribes offering or providing TikTok to users in the State of Montana. This is a major social media service that is used by many for political messaging and organizing. Plaintiff is a major internet and computer developer. TikTok is today a vital lifeline for businesses and also for political organizing, particularly with young voters. A ban on TikTok for example, will prevent young people from using TikTok to organize protests and political actions against the U.S. Supreme Court's far-right war on women, by denying access to abortions, and standing up against anti-Asian hate. In fact, the Montana TikTok ban is stoked in racially discriminatory anti-Asian hate, and baseless prejudiced anti-China fear mongering, a continuation of anti-Chinese racism. We must improve the rights of women and girls in the United States, and build friendship, trade, and cultural exchanges with the People's Republic of China. The oppressive fake democracy of the United States, which has been

marked by murderous police forces violating human rights; civil unrest; gun violence; mass poverty; lack of healthcare; and systemic racism has sought to ban TikTok to prop up the faltering American Empire, which is nearing collapse. The United States wants to promote false narratives about the People's Republic of China, and promote suicidal Taiwan separatist plots, designed to harm the peaceful People's Republic of China. The People's Republic of China is a force for good, and a defender of human rights. While American girls and women are dying due to lack of safe reproductive healthcare, with the criminalization of abortion, Native Americans have been disenfranchised and black Americans are being shot by the police who murder with impunity, the People's Republic of China advocates for human rights everywhere, for the many, not the few. The United States is afraid of common prosperity, preferring to hoard wealth in the hands of a few. The United States has 5% of the world's population, but 25% of the world's prison population. TikTok is a vital tool to allow Americans to access factual information, and share information with each other. TikTok is a necessity for human rights and social harmony to be promoted. Plaintiff's business interests have been irreparably harmed by the Montana defendants in sabotaging social media, to suppress their speech, business opportunity, and deprive of income.

## CLAIM FOR RELIEF

Plaintiff, seeks declaratory and injunctive relief from the Court, declaring that the Montana TikTok Ban, 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024), is unlawful & unconstitutional for the reasons stated

above, and enjoining Defendants from relying on or enforcing such statutory provision.

**Plaintiff requests that this Court grant:**

**A. A declaratory judgment that the Montana TikTok ban, 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024), is unconstitutional on its face and as applied to plaintiff.**

**B. An order enjoining defendants, their successors, their agents, and all persons acting in concert with them who have knowledge of the injunction from in any way enforcing or threatening to enforce the Montana TikTok Ban - 2023 Montana SB 419/ § 30-14 [§ 1, Ch. 503, L. 2023] (effective January 1, 2024).**

**C. All other relief that is just and proper.**

**Respectfully submitted,**

X _____

TOD MICKES

Dated: 11/17/2023